# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA, *ex rel.*, )
GLORIA UPTON, BARBARA ELLIS-STEELE, )
RENE KENNEDY and LOURDES ACOSTA )
and STATE OF ILLINOIS, *ex rel.* GLORIA )
UPTON, BARBARA ELLIS-STEELE, RENE )
KENNEDY and LOURDES ACOSTA, and )
BARBARA ELLIS-STEELE, individually, )
                                   )
            Plaintiffs, )
                                   )    No. 09-cv-6022
      v. )
                                     )
FAMILY HEALTH NETWORK, INC., )
PHILLIP BRADLEY and BARBARA HAY, )
                                     )
           Defendants. )

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

On behalf of the United States and the State of Illinois, Relators Gloria Upton ("Upton"), Barbara Ellis-Steele ("Ellis-Steele"), Rene Kennedy ("Kennedy"), and Lourdes Acosta ("Acosta") (collectively "Relators") have brought this *qui tam* action against Defendants Family Health Network, Inc. ("Family Health"), Philip Bradley, ("Bradley"), and Barbara Hay ("Hay") (collectively, "Defendants") for violation of the federal False Claims Act, 31 U.S.C. § 3729(a) (the "federal FCA") (Count I) and the Illinois False Claims Act, 740 ILCS 175/3(a) (the "Illinois FCA") (Count II). Relator Ellis-Steele, individually, also asserts claims for violation of the federal False Claims Act, 31 U.S.C. § 3730(h) (Count III) and 740 ILCS 175/4(g) (Count IV), relating to the termination of her employment with Family Health after she filed this action. Defendants have moved to dismiss Counts I and II of Relators' Second Amended Complaint under

Federal Rule of Civil Procedure ("Rule") 12(b)(6).  For the reasons set forth below, the Court grants the Defendants' motion, and dismisses Counts I and II without prejudice.

## PROCEDURAL BACKGROUND

Relators filed their Complaint on September 28, 2009.  (R. 1.)  On October 28, 2011, the United States and the State of Illinois declined to intervene.  (R. 12.)  The Court dismissed this case without prejudice for failure to prosecute on January 9, 2012, and on January 11, 2012, the Court vacated such dismissal upon Relator Ellis-Steele's motion.  (R. 22, 24.)  On March 14, 2012, Relators filed their First Amended Complaint. (R. 28.)  On May 1, 2012, the Court granted Relators' motion for leave to file another amended complaint.  (R. 38, 40.)  Relators filed their Second Amended Complaint (the "Complaint") that same day.  (R. 41.)

## RELEVANT FACTS

Relators allege the following facts in support of Counts I and II, which the Court accepts as true for the purposes of this motion.  *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).  Medicaid is a federal and state assistance program that provides healthcare services to low-income individuals and families.  (Compl. ¶ 3.) Family Health is a Managed Care Organization that contracts with Healthcare and Family Services ("HFS"), the Medicaid agency responsible for administering Medicaid in Illinois, to provide healthcare to Medicaid recipients.  (*Id.* ¶¶ 3-4.)  During the pertinent timeframe, Defendant Bradley was Family Health's President and Chief Executive Officer, and Defendant Hay was Family Health's Chief Operations Officer.  (*Id.* ¶¶ 17-18.)  Relators are current and former marketing representatives for Family Health.  (*Id.* ¶¶ 2, 12-15.)

Since 1998, Family Health has contracted with HFS to provide healthcare services. (*Id.* ¶ 20.) Pursuant to those contracts, Family Health was and is obligated to provide healthcare services to "Illinois Medicaid recipients who request[] to participate in Family Health's program," subject to certain exceptions as provided in the contracts.[1] (*Id.* ¶ 21; R. 41-2, 2006 Contract at 5-7.) In exchange, HFS pays Family Health an established "capitation rate per enrolled person per month for those services." (*Id.*) Relators assert that Family Health has "violated the contracts by implementing a fraudulent scheme to ensure that Family Health provided services to a disproportionately healthy population of Medicaid eligible individuals." (Compl. ¶ 22.) Specifically, Defendants have allegedly cherry picked, or refused to enroll particularly needy, chronically ill, or diseased—and thus costly—Medicaid recipients. (*Id.*) Relators allege that by denying expensive healthcare, Family Health has been "able to make fewer payments to healthcare providers and thus retained more of the capitation fee, making exorbitant profits along the way." (*Id.* ¶ 64.)

## I.  Defendants' Alleged Scheme From 1999-2008

From 1999 through 2008, Defendants required Family Health's marketing representatives, including Relators, to meet Medicaid recipients face-to-face so that they could detect whether the applicants were pregnant or had obvious physical

---

[1] Although Relators allege that Family Health is obligated to provide healthcare services to "all" Illinois Medicaid recipients who request participation, that allegation contradicts the express terms of the 2006 Contract, which Relators attached to their Complaint. *See Centers v. Centennial Mortg., Inc.*, 298 F.3d 930, 933 (7th Cir. 2005) (noting that, on a motion to dismiss, "to the extent that the terms of an attached contract conflict with the allegations of the complaint, the contract controls") (citations omitted).

disabilities. (*Id.* ¶ 23.) Additionally, Defendant Hay instructed marketing representatives to question applicants about their need for specialists during the meeting, and to discourage the applicant from enrolling in Family Health's plan (or refuse to enroll the applicant) if the applicant needed a specialist. (*Id.* ¶ 24.) At Defendant Hay's direction, Family Health's marketing representatives were subject to discipline if they "enrolled a Medicaid recipient with a medical condition, or one who ha[d] the potential to develop a medical condition." (*Id.* ¶ 26.)

### A.    Relator Upton

Relator Upton has worked for Family Health since May 9, 2005. (*Id.* ¶ 12.) She alleges that she has experienced Family Health's fraud as both an employee and as a Medicaid recipient. (*Id.* ¶ 27.) In early 2002, before she began working for Family Health, she met with a Family Health marketing representative to request enrollment in its program for herself and her two children. (*Id.* ¶ 28.) When she informed the representative that she has endometriosis and required medicinal injections every three months, Family Health's marketing representative refused to enroll her. (*Id.* ¶ 29.) Three years later, after she began working for Family Health, she told Dr. Munadar Izhar that Family Health's marketing representative had refused to enroll her because of her endometriosis. (*Id.* ¶ 30.) Several days later, Relator Upton met with Defendants Bradley and Hay, as well as David Anderson, Family Health's former Marketing Director. (*Id.* ¶ 31.) At that meeting, Defendant Hay told Relator Upton not to tell anyone that Family Health had refused to enroll her. (*Id.* ¶ 32.)

In the spring of 2009, Relator Upton enrolled a pregnant mother of four children—all of whom had sickle cell anemia—in Family Health's plan. (*Id.* ¶ 34.) Shortly thereafter, the woman asked Upton why she was not yet enrolled in Family

Health's plan.  (*Id.* ¶ 34.)  Relator Upton called the Illinois Client Enrollment Broker ("ICEB"), and learned from an ICEB broker named Alex that although the woman was enrolled on May 1, 2009, Family Health had immediately disenrolled her.  (*Id.*)  In the fall of 2009, Defendant Hay and Mr. Anderson instructed Relator Upton and other Family Health marketing representatives to tell potential enrollees that Medicaid patients seeing a specialist would benefit by not enrolling with Family Health.  (*Id.* ¶ 35.)

### B.    Relator Ellis-Steele

Relator Ellis-Steele worked for Family Health between March 17, 1999 and February 24, 2012.  (*Id.* ¶¶ 13, 36.)  In 2002, she attended a meeting with Defendants Bradley and Hay, as well as a nurse named Karen.  (*Id.* ¶ 37.)  At that meeting, Defendants Hay and Bradley directed her and other marketing representatives not to enroll pregnant women, infants with congenital talipes equinovarus ("CTEV") or hydrocephalus,[2] children with cleft lips, or "anyone seeing a specialist."  (*Id.*)  At the end of 2006, Family Health's management told Relator Ellis-Steel and other marketing representatives that they could enroll pregnant women, but only if the women were not past their second trimester.  (*Id.* ¶ 38.)

### C.    Relator Acosta

Relator Acosta worked for Family Health from January 10, 2000 until March of 2011.  (*Id.* ¶ 15.)  In 2003, Relator Acosta enrolled a baby with hydrocephalus.  (*Id.* ¶¶ 15, 39.)  Defendant Hay then demanded that Relator Acosta go to the baby's home to disenroll the baby and tell the baby's mother that Family Health did not have a specialist for the baby, even though that statement was untrue.  (*Id.* ¶ 40.)  Family Health

---

[2] Relators assert that Family Health referred to these prospective patients as "club feet babies" and "'waterhead' babies."  (Compl. ¶ 37.)  The Court uses the medical terms for

suspended Relator Acosta for five days as punishment for enrolling the baby.  (*Id.* ¶ 41.)  Defendant Hay also forced Relator Acosta to disenroll a family whose child was HIV-infected.  (*Id.* ¶ 43; *see also* R. 55, Relators' Notice of Errata.)

## II.     Defendants' Current "Back-Door" Cherry-Picking Scheme

After ceasing their "cherry picking" scheme in 2008, Defendants began a "new, more covert scheme to ensure applicants who saw mental health specialists were disenrolled."  (Compl. ¶ 45.)  Specifically, if a member asked to see a mental health specialist, Family Health instructed the member to call an affiliated company that will, in turn, provide the member with the contact information for a specialist.  (*Id.* ¶ 46.)  When the member called the specialist, however, the member was told that the specialist is not affiliated with Family Health.  (*Id.* ¶ 47.)  A large percentage of members voluntarily disenrolled from Family Health, believing that they cannot obtain the treatment that they need.  (*Id.* ¶ 48.)

## III.    Defendants' Concealment of the Fraud

According to Relators, Defendants have concealed their allegedly fraudulent acts in two ways.  First, Family Health destroyed documentation of its fraud by regularly destroying unprocessed applications so that it appears that these applicants never applied.  (*Id.* ¶ 50.)  In 2010, Defendant Hay "orchestrated the shredding of thousands of disenrolled-members' records – brought from hospitals to Family Health by a nurse named Susan Olsen."  (*Id.*)  Second, Family Health did not have a compliance committee until 2011, even though its contracts with HFS required it to have such a committee.  (*Id.* ¶ 51.)  Although Family Health formed a compliance committee in

these conditions.

2011, Relators allege that it is a "sham" because Defendant Hay serves as the committee's liaison to HFS. (*Id.*) If a Family Health employee uncovers fraudulent acts, the employee's only choice is to report the fraud to Defendant Hay, who, in turn, "conceals the employee's report and/or terminates the reporting employee." (*Id.*) In 2010, after a Family Health employee overheard a marketing manager instruct marketing representatives not to enroll pregnant women, the employee reported the manager to Defendant Hay, who told the employee that nothing would be done about the manager's instructions. (*Id.* ¶ 52.) When Defendant Hay learned that the employee had prepared a written complaint to submit to the state, Defendant Hay fired the employee. (*Id.*)

## IV. Defendants' Certifications

Relators allege that as a condition of receiving payment under the Medicaid managed care program, federal regulations and the 2006 contract between HFS and Family Health (the "2006 Contract") require Family Health to certify its compliance with the 2006 Contract and federal law. (*Id.* ¶ 61.) Relators allege that Defendants falsely certified to HFS that they had not identified any fraud, abuse or misconduct, and they further failed to accurately, truthfully, and completely disclose the ongoing fraudulent scheme. (*Id.* ¶ 62.) Further, Relators allege that Defendants have made and continue to make these false certifications on a quarterly basis in order to receive payments from the government. (*Id.* ¶¶ 62-63.)

## LEGAL STANDARD

I.     Rule 12(b)(6)

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of*

7

*Chicago Lodge No. 7,* 570 F.3d 811, 820 (7th Cir. 2009). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *AnchorBank,* 649 F.3d at 614 (internal quotation and citation omitted). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).

"In evaluating the sufficiency of the complaint, [courts] view it in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank,* 649 F.3d at 614. "To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face . . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Indep. Trust Corp. v. Stewart Info. Servs. Corp*., 665 F.3d 930, 934-35 (7th Cir. 2012) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (internal quotation marks omitted)).

"The complaint 'must actually suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level.'" *Indep. Trust Corp.*, 665 F.3d at 935 (citing *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.,* 536 F.3d 663, 668 (7th Cir. 2008)). "[A] plaintiff's claim need not be

probable, only plausible: 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (citing *Twombly,* 550 U.S. at 556 (internal quotation omitted)). "To meet this plausibility standard, the complaint must supply 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence' supporting the plaintiff's allegations." *Id.* (citing *Twombly,* 550 U.S. at 556).

II.     Rule 9(b)

        "The [False Claims Act] is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b)." *United States ex rel. Fowler v. Caremark R.X. L.L.C.*, 496 F.3d 730, 740-41 (7th Cir. 2007), *overruled on other grounds by Glaser v. Wound Care Consultants, Inc*., 570 F.3d 907 (7th Cir. 2009) (quoting *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005)). Rule 9(b) imposes a higher pleading standard than that required under Rule 8. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011). Specifically, Rule 9(b) requires a pleading to state with particularity the circumstances constituting the alleged fraud. *See* Fed. R. Civ. P. 9(b); *Pirelli*, 631 F.3d at 441-42. This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (citation omitted); *see also Pirelli*, 631 F.3d at 441-42. "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To ensure that the courts and litigants do not "erroneously take an overly rigid view of the formulation," the Seventh Circuit has acknowledged that the "the requisite information . .

. may vary on the facts of a given case." *Pirelli*, 631 F. 3d at 442. "To say that fraud has been *pleaded* with particularity is not to say that it has been *proved* (nor is proof part of the pleading requirement)." *United States ex rel. Lusby v. Rolls-Royce Corp*., 570 F.3d 849, 854 (7th Cir. 2009) (emphasis in original).

## ANALYSIS

### I. Federal and Illinois False Claims Acts

Under the federal FCA, "private individuals . . . referred to as 'relators,' may file civil actions known as *qui tam* actions on behalf of the United States to recover money that the government paid as a result of conduct forbidden under [the False Claims] Act." *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011) (citation omitted).[3] The federal FCA imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to get a payment from the government. 31 U.S.C. § 3729(a)(1). A claim under § 3729(a)(1) has three essential elements: (1) the defendant made a statement in order to receive money from the government, (2) the statement was false, and (3) the defendant knew it was false. 31 U.S.C. § 3729(a)(1); *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005). To survive a motion to dismiss, Relators must "identify specific false claims for payment or specific false statements made in order to obtain payment." *United States ex rel. Garst v. Lockheed-Martin Corp*.,

---

[3] "In 2009, Congress amended the False Claims Act, Pub. L. 111-21, § 4(a)(1), making those amendments generally applicable only to conduct occurring on or after May 20, 2009, Pub. L. 111-21, § 4(f). The one exception is the amendment to section 3729(a)(1)(B), which applies to cases . . . that were pending on or after June 7, 2008." *Yannacopoulos,* 652 F.3d at 822 n.2.

328 F.3d 374, 376 (7th Cir. 2003). An FCA claim premised upon an alleged false certification of compliance with statutory or regulatory requirements also requires that the certification of compliance be a condition of or prerequisite to government payment. *United States ex rel. Crews v. NCS Healthcare of Illinois, Inc.*, 460 F.3d 853, 858 (7th Cir. 2006); *Gross*, 415 F.3d at 604 (citations omitted). Relators' pleading standard is the same for their cause of action under the Illinois FCA.[4] *See United States ex rel. Kennedy v. Aventis Pharm., Inc.*, 512 F. Supp. 2d 1158, 1163 n. 2 (N.D. Ill. 2007) (citing *Humphrey v. Franklin-Williamson Human Servs., Inc.,* 189 F. Supp. 2d 862, 867 (S.D. Ill. 2002)).

Defendants argue that Relators have failed to meet Rule 9(b)'s heightened pleading standard in alleging the underlying scheme and the "false or fraudulent claim." (R. 45, Defs.' Mot. to Dismiss at 2.) They further argue that many of Relators' allegations fall outside of the applicable limitations period. (*Id.*) Finally, they contend that Relators have failed to identify any false claims submitted for payment that could form the basis of an FCA violation. (*Id.*)

---

[4] Effective July 27, 2010, the Illinois Whistle Blower Protection Act was re-amended and codified as the Illinois False Claims Act. *See* Ill. Pub. Act 96–1304, § 10

## II. Relators Adequately Plead Defendants' Underlying Scheme from 2002 through 2008

Defendants argue that Relators have failed to adequately pled an underlying fraudulent scheme. They assert that many of the allegations fall outside of the applicable limitations period, and they further contend that Relators' factual allegations are "unfounded and implausible." (R. 46, Defs.' Mem. in Supp. of Mot. to Dismiss at 4.) Defendants' arguments are unpersuasive.

Viewing Relators' Complaint as a whole and drawing all reasonable inferences in their favor, as the Court must do on a Rule 12(b)(6) motion, the Complaint sufficiently alleges Defendants' underlying fraudulent scheme from 2002 through 2008.[5] *See Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011) (to survive a motion to dismiss, "the complaint taken as a whole must establish a nonnegligible probability that the claim is valid, though it need not be so great a probability as such terms as 'preponderance of the evidence' connote"); *Rusinowski v. Vill. of Hillside*, 835 F. Supp. 2d 641, 650 (N.D. Ill. 2011) ("although the conclusory language in parts of the Complaint is not particularly enlightening, the allegations are sufficient to defeat a motion to dismiss when read in light of the complaint as a whole"). Relators plausibly allege that Family Health and Defendants Hay and Bradley discriminated against Medicare recipients with potentially costly medical conditions. They effectuated their

---

[5] Relators have failed to allege with the requisite particularity that any fraudulent activity occurred from 1999 to 2001 and 2008 to the present. They do not cite a single specific example of the underlying fraudulent scheme that occurred prior to 2002. Their allegations with respect to the "new, covert" fraudulent scheme, which allegedly began in 2008 and continues through the present, are conclusory and fail to meet Rule 9(b)'s heightened pleading requirement.

discrimination by instructing representatives not to enroll these types of patients, disciplining representatives who did so, and disenrolling costly applicants.

Relators allege several instances of the fraudulent scheme in practice. *See Mason v. Medline Indus., Inc.*, 731 F. Supp. 2d 730, 735 (N.D. Ill. 2010) ("A plaintiff who pleads a fraudulent scheme involving numerous transactions over a period of years need not plead specifics with respect to every instance of fraud, but he must at least provide representative examples."). On May 1, 2009, for example, Relator Upton alleges that she enrolled a pregnant woman whom Family Health later disenrolled, and that subsequently, Defendant Hay and Mr. Anderson told Relator Upton and others not to enroll patients who required specialists. (Compl. ¶¶ 34-35.) In 2003, Defendant Hay forced Relator Acosta to go to a patient's home and personally disenroll a baby with hydrocephalus, and Family Health then suspended Relator Acosta for failure to follow instructions. (*Id.* at ¶¶ 40-41.) Around 2003, according to the Complaint, Defendant Hay instructed Relator Ellis-Steele to disenroll an HIV-infected patient whom she had previously enrolled. (*Id.* ¶ 42.)

Defendants' attempts to provide innocent, alternative explanations for the alleged refusal to enroll participants are unpersuasive at this stage in the litigation. The Court cannot make factual determinations at the motion to dismiss stage, and Relators do not have the burden to discount all of Defendants' innocent explanations. *See Lusby*, 570 F.3d at 845-55 (explaining that a pleading does not need to "exclude all possibility of honesty in order to give the particulars of fraud" and "[t]o say that fraud has been *pleaded* with particularity is not to say that it has been *proved* (nor is proof part of the pleading requirement)")

(emphasis in original).  Relators have satisfied the Rule 9(b) standard in alleging

the underlying, fraudulent, "cherry picking" scheme from 2002 to 2008.  *See*

*Pirelli*, 631 F.3d at 442.

### A.    Defendants' Argument that the Allegations in the Complaint Contradict the Contracts Is Unpersuasive

Defendants further argue that Relators' allegations regarding Family

Health's refusal to enroll and disenrollment of applicants contradict the terms of

the 2006 Contract, which Relators attached to their Complaint.  Specifically,

Defendants assert that the 2006 Contract, contrary to Relators' allegation, does

not require Family Health to provide healthcare services to "all" Illinois Medicaid

recipients who request to participate in its program, as evidenced by several

exclusions in the 2006 Contract.  (*See* R. 41-2, 2006 Contract at 5-7.)  While

Defendants are correct that the 2006 Contract provides certain exclusions, that

does not render Plaintiffs' allegations implausible.  Specifically, the 2006 Contract

does not contradict Relators' allegations that Defendants refused to enroll

applicants because of the applicants' underlying medical conditions.  At the

pleading stage, Relators do not need to plead around all potential defenses.  *See*

*Lusby*, 570 F.3d at 855 ("No complaint needs to rule out all possible defenses").

Defendants further argue that the terms of the 2009 contract between

Family Health and HFS (the "2009 Contract") require marketing representatives

to meet with enrollees face-to-face, and the 2006 Contract requires a potential

enrollee to answer whether the person is pregnant, has a chronic illness, or sees

a specialist for ongoing care.  (R. 46, Mem. in Supp. of Mot. to Dismiss at 5.)

According to Relators, those provisions render implausible Relators' allegation

that Defendants met with potential enrollees face-to-face so that they could detect whether the enrollee had a medical condition. Relators' allegations, however, do not rest solely on the mere existence of these face-to-face meetings, but go a step further to aver that Defendants refused to enroll and disenrolled applicants because of their medical conditions, about which Family Health's marketing representatives learned during the face-to-face meetings. Defendants do not point to any portion of the contracts that allow them to refuse to enroll or affirmatively disenroll applicants on that ground. Moreover, the 2009 Contract does not apply to Relators' pre-2009 allegations.

Additionally, Defendants argue that the 2006 Contract vests the State of Illinois with the exclusive right to determine an individual's eligibility for Family Health's program, and therefore Relators' allegations regarding Family Health's determinations of eligibility are implausible. (*Id.* at 6.) They further argue that the State of Illinois handles, exclusively, enrollment procedures through the Client Enrollment Broker Program (the "CEB Program"), and that Family Health does not have unilateral authority or ability to disenroll participants or to terminate coverage because the State of Illinois has the ultimate authority to approve a termination. (*Id.*) These arguments, however, do not support dismissal of Relators' Complaint at this early stage in the litigation.

As Relators point out, even if the State of Illinois has the ultimate authority to refuse to enroll an applicant, that does not negate the inference that Family Health's marketing representatives could initially refuse to allow a potential enrollee to fill out the necessary forms to start the enrollment process in the first instance. *See AnchorBank*, 649 F.3d at 614 (on a Rule 12(b)(6) motion, courts

15

must view the complaint in the light most favorable to the plaintiff, "taking as true all well-pleaded allegations and making all possible inferences from the allegations in the plaintiff's favor"). It also does not preclude Family Health's marketing representatives from discouraging potential applicants from enrolling. Indeed, other terms of the 2006 Contract expressly contemplate Family Health's involvement in the enrollment process. (*See, e.g.*, R. 41-3, 2006 Contract at 28 (providing that Family Health agrees, among other things, not to "engage in Marketing practices that mislead, confuse or defraud either Potential Enrollees or the Department" and that "Potential Enrollees may not be discriminated against on the basis of health status or need for healthcare services or on any illegal basis").)

Moreover, Defendants' argument that the State of Illinois, and not Family Health, handles enrollment procedures through the CEB Program does not contradict the Complaint's allegations because, as Defendants concede, that protocol was not in place until 2008. (R. 46, Mem. in Supp. of Mot. to Dismiss at 6.) This is consistent with Relators' allegations, which provide that Defendants' fraudulent scheme included instructions not to enroll applicants with medical conditions through 2008.[6] (*See*, *e.g.*, Compl. ¶ 26.) Indeed, Relators allege that Defendants Bradley and Hay "stopped giving Family Health's marketing representatives explicit instructions to cherry pick applicants in or around 2008." (*Id.* ¶ 45.)

---

[6] Relators' Complaint does, however, contain some allegations that Family Health's employees refused to enroll applicants after 2008. (*See, e.g.*, Compl. ¶¶ 34-35, 52.)

Defendants' argument with respect to disenrollment fares no better, particularly because the 2006 Contract provides that a participant may voluntarily disenroll at any time and that Family Health could request that the Department disenroll a participant for various reasons.  (*See* R. 41-3, 2006 Contract at 16.)  The 2006 Contract does not preclude the possibility that Defendants convinced participants to voluntarily disenroll by telling them, for example, that Family Health does not have a specialist to treat their condition, or that Defendants participated in disenrolling the participants.  (*See, e.g.*, Compl. ¶¶ 39-41.)

**B.    Defendants' Statute of Limitations Argument Fails Because at Least Some of the Alleged Conduct Falls Within the Applicable Statute of Limitations Period**

Defendants argue that the Court should dismiss Counts I and II because the conduct alleged in those counts falls outside the six-year statute of limitations.  (R. 46, Mem. in Supp. of Mot. to Dismiss at 4.)  Relators dispute that the applicable statute of limitations period is six years.  *See* 31 U.S.C. § 3731(b) ("A civil action under section 3730 may not be brought (1) more than 6 years after the date on which the violation of section 3729 is committed, or (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no even more than 10 years after the date on which the violation is committed, whichever occurs last."); 740 ILCS 175/5(b) (same, except reference to "official of the United States" is replaced with "official of the State").  Relators further argue that regardless of whether the applicable statute of limitations period is ten or six years, their claims are not subject to dismissal because, at a minimum, some of the conduct

occurred within the applicable statute of limitations period.  (Mem. in Resp. at 21-23.)  The Court agrees.  *See Indep. Trust*, 665 F.3d at 935 ("A statute of limitations provides an affirmative defense," and only "when a plaintiff's complaint [] sets out all of the elements of an affirmative defense, [is] dismissal under Rule 12(b)(6) appropriate.") (citing *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009)).


### III.    Relators Adequately Plead that Defendants Submitted False Certifications to the Government

Relators have adequately pled the existence and nature of the false or fraudulent claims and statements.  Relators allege that Defendants made quarterly certifications pursuant to section 5.25(a)(4) of the 2006 Contract, which states:

> (a) [Family Health] shall have an affirmative duty to timely report suspected Fraud, Abuse, or criminal acts in the HFS Medical Program by Participants, Providers, the Contractor's employees, or Department employees to [HFS's] Office of Inspector General.  To this end, the Contractor shall establish the following procedures in writing:
>
> . . .
>
> (4) [Family Health] shall submit a quarterly report certifying that the report includes all instances of suspected Fraud or Abuse or shall certify that there was no suspected Fraud or Abuse during that quarter.  Reports shall be considered timely if they are made as soon as [Family Health] knew or should have known of the suspected Fraud or Abuse and the certification is received within thirty (30) days after the end of the quarter.

(Compl. ¶ 60; *see also* 2006 Contract, § 5.11(a)(4) (requiring Family Health to "report all suspected Fraud and Abuse as required under Article V, Section 5.25 of this Contract").)  Relators allege that Defendants "falsely certified to HFS that

they had not identified any fraud, abuse or misconduct, and failed to accurately, truthfully, and completely disclose the ongoing scheme of fraud alleged herein." (*Id.* ¶ 62.)  Moreover, they allege that "[t]hese false certifications were made and continue to be made on a quarterly basis to HFS . . . ." (*Id.*)  These allegations adequately plead the false or fraudulent claim or statement.  *See Lusby*, 570 F.3d at 853-55.

In *Lusby*, the plaintiff alleged that the defendant was contractually bound to meet certain specifications for the engines it built for the government.  *Id.* at 850-51.  Despite consistently making substandard engines that did not meet these specifications, the defendant certified that the engines met the contracts' specifications in its requests for payment to the government.  *Id.* at 851.  The plaintiff had alleged that specific inferior parts shipped on specific dates for payments, yet it did not provide specific details about the defendant's certifications and requests for payments.  *Id.* at 854.  The plaintiff did not have access to the certifications and requests, but reasoned that the defendant must have submitted them because the contract with the government required them as a part of the invoice.  *Id.*  As Defendants do here, the defendant in *Lusby* contended that without alleging specifics regarding the certifications and requests for payments, the plaintiff failed to plead a False Claims Act claim with particularity as required by Rule 9(b).  *Id.*  The Seventh Circuit disagreed, explaining that it is not "essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit.  True, it is essential to show a false statement.  But much knowledge is inferential." *Id.*  The court further noted that "[i]t is enough to show, in detail, the nature of the charge, so

that vague and unsubstantiated accusations of fraud do not lead to costly discovery and public obloquy." *Id.* at 854-55. Because the complaint detailed specific incidences of the fraud coupled with a well-pled general scheme, the court determined that it had met that burden and thus survived the defendant's motion to dismiss.

Here, Relators allege that despite being contractually bound not to discriminate in enrollment, Family Health did so, and it repeatedly certified to the government, as it was contractually obligated to do, that it had not. As discussed above, Relators have described specific incidences of the well pled "cherry picking" scheme. Therefore, their inability to provide the certifications' dates, identification numbers, or verbatim content does not preclude them from adequately pleading a false claim. *See Lusby*, 570 F.3d at 854. As the Seventh Circuit has recognized, a relator is unlikely to have access to the particular certifications, and therefore precluding a plaintiff from asserting a False Claims Act cause of action because the relator does not have access to the particular paperwork would excise "a big bite out of *qui tam* litigation." *Id. But cf. Fowler*, 496 F.3d at 742 (holding that the plaintiffs failed to meet Rule 9(b)'s particularity requirement where they did "not present any evidence at an individualized transactional level").[7]

---

[7] Because *Lusby* is more recent than *Fowler*, the Court finds it controlling. The Seventh Circuit did not discuss *Fowler* in *Lusby*. The district court in *Lusby,* however, had relied on *Fowler*'s "individualized transaction" language in dismissing the plaintiff's

**IV.    Relators Fail to Allege that the Defendants Submitted the Certifications to Receive Payment From the Government**

Relators fail, however, to adequately allege that the certifications were conditions for payment.  In the Seventh Circuit, "where an FCA claim is based upon an alleged false certification of regulatory compliance, the certification must be a condition of the government payment in order to be actionable."  *Gross*, 415 F.3d at 605.  A *qui tam* plaintiff must expressly "'link' her allegations of fraud 'to any claim for payment.'"  *U.S. ex rel. Tucker v. Nayak*, 2008 WL 140948 (S.D. Ill. Jan. 11, 2008) (quoting *Garst*, 328 F.3d at 378).  Absent such allegations, it is implausible that the certifications were conditions for payment.  *See United States ex rel. Wildhirt v. AARS Forever, Inc.*, No. 09 C 1215, 2011 WL 1303390, at *5 (N.D. Ill. Apr. 6, 2011) (dismissing complaint, stating that "[a]lthough the complaint alleges that Defendants were required to certify that they *would* comply with applicable regulations as a condition of *enrolling* in the Medicare and Medicaid programs, the complaint does not allege that Defendants were required to accompany each *claim for payment* with a certification that they *had* complied with applicable regulations") (emphasis in original)).

Here, Relators provide only conclusory allegations that the certifications were "a condition to receiving payment," and that Family Health submitted the false certifications "in order to receive payments from the Governments." (Compl. ¶¶ 61, 63.)  They do not, however, explain how Defendants' certifications are conditions for payment, nor do they cite any contractual

---

complaint.  *See United States ex rel. Lusby v. Rolls-Royce Corp.*, No. 03-cv-0680, 2008 WL 4247689, at *8 n.9 (S.D. Ind. Sept. 10, 2008).  On appeal, the Seventh Circuit reversed the district court's decision.  *See Lusby*, 570 F.3d at 854-55.

provision that supports that proposition.  *See Gross*, 415 F.3d at 605 (holding that

the plaintiff did not plead FCA claim where the complaint's "conclusory

allegations shed no light on the nature or content of the individual forms or why

any particular false statement would have caused the government to keep the

funding spigot open, much less when any payments occurred or how much

money was involved").

Relators contend that their allegations are sufficient because they allege

that the certifications are "conditions for participation," which are actionable FCA

claims in the Seventh Circuit.  (Mem. in Resp. at 18, citing *United States ex rel.*

*Main v. Oakland City Univ.*, 426 F.3d 914 (7th Cir. 2005) and *United States ex*

*rel. Tyson v. Amerigroup Ill., Inc.*, 488 F. Supp. 2d 719, 725 (N.D. Ill. 2007).)

Relators' argument fails, however, because alleging that the claims are

"conditions for participation" is only sufficient if the plaintiff asserts liability on a

fraudulent inducement theory, which Relators have not done.

In *Oakland City*, the court held that when the defendant enters into a

contract never intending to keep its promise in exchange for payments, "[t]he

[FCA] requires a causal rather than a temporal connection between fraud and

payment," and that "[i]f a false statement is integral to a causal chain leading to

payment," it constitutes a false claim or statement.  426 F.3d at 916 (citation

omitted).  In this case, Relators fail to plead that Defendants fraudulently induced

HFS to enter into a contract.  Instead, Relators have pled an "after-the-fact"

breach of contract, which is not an actionable claim under the FCA.  *Id.* at 917

("[F]raud requires more than breach of promise: fraud entails making a false

representation, such as a statement that the speaker will do something it plans

not to do."); *Gen. Dynamics*, 652 F.3d at 824 ("a mere breach of contract does not give rise to liability under the False Claims Act") (citing *United States ex. Rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1168 (10th Cir. 2010)); *see also Amerigroup*, 488 F. Supp. 2d at 725 ("'[M]aking a promise that one intends not to keep is fraud' and actionable under the FCA; an after-the-fact breach of a contract-that was not planned at the time the contract was entered into-is just that: a breach.") (quoting *Oakland City*, 426 F.3d at 917)).

The only allegations in Relators' Complaint that even suggest fraudulent inducement are conclusory. (Compl. ¶¶ 67-68.[8]) Indeed, Relators repeatedly assert in their Complaint that Defendants breached their contracts with HFS after-the-fact. (*See* Compl. ¶¶ 53-63, under the heading "The Defendants' Wrongful Conduct Breached the Contract Between Family Health and HFS"). *Cf. Oakland City*, 426 F.3d at 917 ("To prevail in this suit [the plaintiff] must establish that the [defendant] not only knew, when it signed the phase-one application, that contingent fees to recruiters are forbidden, but also planned to continue paying those fees while keeping the [government] in the dark."); *Amerigroup*, 488 F. Supp. 2d at 725 (explaining that under *Oakland City*, the plaintiffs must show that "(1) the non-discrimination provisions were prerequisites to participation in the [] program under federal law; (2) [defendants] knew when [they] signed the []

---

[8] Relators allege in paragraph 67 that "the Governments [sic] would not—and in fact could not—have paid Family Health if the Governments [sic] knew that the Defendants' certifications were false, or that critical information was being omitted, *or that the contracts were induced by fraud.*" (Compl. ¶ 67 (emphasis added).) Paragraph 68 provides that "[b]y submitting false certifications, or by omitting critical information, *or by fraudulently inducing HFS to sign the 2006 Contract and earlier contracts,* the Defendants knowingly made, used or caused to be made a false record in order to get fraudulent claims paid by the Governments [sic]." (*Id.* ¶ 68 (emphasis added).)

23

Contract with the [government] that discriminatory marketing practices were forbidden; and (3) [defendants] planned to utilize discriminatory marketing practices."); *see also Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787 (4th Cir. 1999) ("Courts . . . found False Claims Act liability for each claim submitted to the government under a contract, *when the contract or extension of government benefit was obtained originally through false statements or fraudulent conduct.*") (emphasis added).

Even applying the "conditions of participation" framework, Relators' allegations are nevertheless insufficient because Relators do not allege facts to support an inference that the certifications are causally linked to the government's capitation payments. In *Oakland City*, it was apparent that but-for signing the phase-one certification, the defendants would not have been eligible for federal funds, and thus the phase-one form was "integral," albeit indirect, to receiving government payments. Relators here allege that "the Governments [sic] would not – and in fact could not – have paid Family Health if the Governments knew that Defendants' certifications were false" (Compl. ¶ 67), but they do not allege any facts to support that conclusory assertion. Indeed, they do not cite to any contractual language or other reason to suggest that the government would not have paid Family Health the capitation rates if Family Health had provided truthful quarterly certifications or had not provided quarterly certifications at all. Even under the "conditions for participation" line of cases, Relators must still allege how the certifications are linked to government payments.

## CONCLUSION

For the reasons set forth above, the Court dismisses Counts I and II of Relators'
Second Amended Complaint without prejudice.  Relators are granted leave until
October 22, 2012 to file a Third Amended Complaint.

**DATED: October 1,  2012**                ENTERED

_____
AMY J. ST. EVE
United States District Court Judge